STUART F. DELERY
Acting Associate Attorney General
MICHAEL D. GRANSTON
TRACY L. HILMER
ARTHUR S. DI DIO
DAVID M. FINKELSTEIN
U.S. Department of Justice
Post Office Box 261
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 616-2971
David.M.Finkelstein@usdoj.gov

Attorneys for the United States

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CARY SAVITCH and GARY PROFFETT | Civil Action No. 13-03363 DDP (PJWx) |
| Plaintiff, | **UNITED STATES' COMPLAINT IN INTERVENTION** |
| vs. | |
| ARIA O. SABIT, M.D. | |
| Defendant. | |

The United States of America brings this action against the Aria Sabit, M.D.

## NATURE OF ACTION

1. This is an action to recover damages and civil penalties under the False Claims Act (FCA), 31 U.S.C. §§ 3729-33, and to recover monetary relief for common law or equitable causes of action for payment by mistake and unjust enrichment. The United States' claims arise out of Dr. Aria Sabit's scheme to bill the Medicare program for medically unnecessary surgeries that Dr. Sabit performed, for services that were not performed as he claimed, and for the false or fraudulent and unpayable claims that Dr. Sabit caused Community Memorial Hospital in Ventura, California, to submit for hospital services related to such surgeries.

## JURISDICTION

2. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1345 because the United States is the Plaintiff. In addition, the Court has subject matter jurisdiction over the FCA cause of action under 28 U.S.C. § 1331. The Court has personal jurisdiction over the defendant pursuant to 31 U.S.C. § 3732(a) because at all relevant times the defendant transacted business in the Central District of California.

## VENUE

3. Venue is proper in the Central District of California under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Dr. Sabit performed surgeries in this

district during the relevant time period, and many of the events giving rise to these claims occurred in this district.

## PARTIES

4.     The United States of America is the plaintiff.  The United States brings this action on behalf of the United States Department of Health and Human Services (HHS), including HHS's component, the Centers for Medicare and Medicaid Services (CMS), which administers the Medicare and Medicaid Programs.

5.     Relator Cary Savitch, M.D., is a resident of Ventura County, California.  Dr. Savitch is Board Certified in the treatment of infectious disease.  Relator Gary Proffett, M.D., is a resident of Ventura County, California.  Dr. Proffett is the Director of Seaview Independent Physician Association.

6.     On May 13, 2013, Drs. Savitch and Proffett filed a *qui tam* complaint with this Court captioned, *United States ex rel. Savitch, et al. v. Aria Sabit, et al.*, Case No. 13-3363 (C.D. Cal.).  The complaint alleges that Dr. Sabit, his employer (Dr. Moustapha Abou-Samra), and the California hospital in which he practiced (Community Memorial Health System) submitted claims to Medicare for spinal fusion surgeries that were medically unnecessary.  On July 2, 2014, the United States intervened in part in the *qui tam* action.  Specifically, the United States intervened in Relators' claim that Dr. Sabit submitted and caused to be submitted

claims to the Medicare program for surgeries and related hospital services that were medically unnecessary.

7.    Defendant Aria Sabit, M.D. is a resident of Michigan, whose last known address is 848 Ann Street, Birmingham, Michigan, 48009. His principal place of business is 29355 Northwestern Highway, Suite 130, Southfield, Michigan, 48034. Between April 2010 and June 2012, Dr. Sabit was an enrolled Medicare physician. Between June 2009 and December 2010, Dr. Sabit resided in Ventura, California, where he performed surgeries.

## BACKGROUND

### I. THE MEDICARE PROGRAM

8.    In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, known as the Medicare Program, to pay for the costs of certain health care services. 42 U.S.C. § 1395, *et seq.* Entitlement to Medicare benefits is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426 to 426-1.

9.    The Department of Health and Human Services (HHS) is responsible for the administration and supervision of the Medicare Program. The Centers for Medicare & Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program. For purposes of this action, there are two primary components to the Medicare Program: Part A and

Part B. Medicare Part A authorizes payment for institutional care, including inpatient hospital services, skilled nursing facilities, and home health care. *See* 42 U.S.C. §§ 1395c to 1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of "medical and other services." *See* 42 U.S.C. §§ 1395j to 1395w-5.

10. To participate in the Medicare Program, a health care provider must file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with the requirements that the Secretary deems necessary for participation in the Medicare Program and in order to receive reimbursement from Medicare.

11. Medicare reimburses only those services furnished to beneficiaries that are "reasonable and necessary for the diagnosis or treatment of illness or injury...." 42 U.S.C. § 1395y(a)(1)(A). In submitting claims for payment to Medicare, providers must certify that the information on the claim form presents an accurate description of the services rendered and that the services were reasonably and medically necessary for the patient.

**A. Medicare Part A**

12. Part A of the Medicare program authorizes payment for institutional care, including hospitalization, for eligible patients.

13.    Under Medicare Part A, hospitals enter into an agreement with Medicare to provide health care items and services to treat Medicare patients. The hospital, also called a "provider," is authorized to bill Medicare for that treatment.

14.    During the relevant time period, CMS reimbursed hospitals for inpatient Part A services through Medicare Administrative Contractors (MACs).

15.    MACs are private insurance companies that are responsible for determining the amount of payments to be made to providers. *See* 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006). Under their contracts with CMS, MACs review, approve, and pay Medicare bills, called "claims," received from hospitals. *See* 42 C.F.R. § 421.5(b). Those claims are paid with federal funds.

16.    Since 2007, in order to get paid, a hospital must complete and submit a claim for payment on a Form UB-04. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare program relies upon the accuracy and truthfulness of the UB-04 Forms to determine whether the service is payable and what amounts the hospital is owed.

17.    In addition, and at the end of each fiscal year, a hospital submits to the MAC a form, referred to as a "cost report," which identifies any outstanding costs that the hospital is claiming for reimbursement for that year. The cost report serves as the final claim for payment that is submitted to Medicare. The Medicare

program relies upon the accuracy and truthfulness of the cost report to determine what amounts, if any, the hospital is owed, or what amounts the hospital has been overpaid during the year.

18.     In 1983, Congress established the prospective payment system (PPS) as the system by which hospitals are reimbursed for inpatient hospital costs. Under PPS, the amount Medicare pays a hospital for treating an inpatient Medicare beneficiary is based in large part on the particular condition that led to the patient's admission to, or that was principally treated by, the hospital.

19.     Under PPS, a patient's illness or condition is categorized under a classification system called a diagnostic related group (DRG). The DRG establishes how much the hospital will be paid under Medicare and reflects the resources the patient's condition or treatment typically requires. The MAC uses the patient specific information (for example, the diagnosis codes) submitted by the hospital on the UB-04 to determine what DRG is assigned to a certain claim, and hence, what amount will be paid.

20.     The DRG is intended to reimburse the hospital for the expected costs of any items that it must purchase in connection with the hospitalization. The DRG is intended to compensate the hospital for any spinal implants, where those devices are appropriately used to treat a Medicare beneficiary.

## B. Medicare Part B

21.    Medicare Part B is funded by insurance premiums paid by enrolled Medicare beneficiaries and by contributions from the Federal Treasury.  Eligible individuals who are 65 or older, or disabled, may enroll in Medicare Part B to obtain benefits in return for payments of monthly premiums.  Payments under Medicare Part B are typically made directly under assignment to service providers and practitioners, such as physicians, rather than to the patient/beneficiary.  In that case, the physician bills the Medicare Program directly.

22.    The United States provides reimbursement for Medicare Part B claims from the Medicare Trust Fund through CMS.  To assist in the administration of the Medicare Part B Program, CMS contracts with MACs.  42 U.S.C. § 1395u.  MACs are responsible for processing the payment of Medicare Part B claims to providers on behalf of CMS.

23.    In order to bill Medicare, a physician must submit an electronic or hard-copy claim form called a CMS 1500 form to the carrier.  When the CMS 1500 is submitted, the physician certifies that he or she is knowledgeable of Medicare's requirements and that the services for which payment is sought were "medically indicated and necessary for the health of the patient."  The CMS 1500 form also contains a certification by means of which the physician in whose name the claim is submitted has complied with the Anti-Kickback Statute.

24.   Physicians wishing to submit the CMS 1500 electronically must submit a provider enrollment form.

25.   For a CMS 1500 claim to be paid by the Medicare Part B Program, the claim must identify each service rendered to the patient by the physician. The service is identified through a corresponding code that is listed in the American Medical Association (AMA) publication called the Current Procedural Terminology (CPT) Manual. The CPT is a systematic list of codes for procedures and services performed by or at the direction of a physician. Each procedure or service is identified by a five-digit CPT code.

26.   In addition to the CPT Manual, the AMA publishes the International Classification of Diseases (ICD-9) Manual, which assigns a unique numeric identifier to each medical condition. In order to be payable by Medicare, the CMS 1500 claim form must identify both the CPT code that the provider is billing for and the corresponding ICD-9 code that identifies the patient's medical condition that renders the provider's service medically necessary.

## II. SPINAL SURGERY

27.   There are four regions of the spine: the cervical, thoracic, lumbar, and sacral regions. The cervical spine consists of seven vertebrae in the neck region; the thoracic spine consists of twelve vertebrae in the chest region; and the lumbar spine consists of five vertebrae in the lower back region. The sacral region of the

9

spine is below the lumbar region and consists of additional fused (or non-articulating) vertebrae.

28.   Each vertebra of the spine is referred to by a letter and number denoting its region and location.  From top to bottom, the seven vertebrae of the cervical spine are named C1-C7; the twelve vertebrae of the thoracic spine are named T1-T12; and the five vertebrae of the lumbar spine are named L1-L5.  In addition, the vertebra of the sacral spine that adjoins the lumbar spine is named S1.

29.   A discectomy is a surgical procedure to remove a herniated, intervertebral disc.

30.   A laminectomy is a surgical procedure to remove the lamina, which is the back part of the vertebra.

31.   A corpectomy is a surgical procedure to remove all or the majority of a vertebral body, which is the front part of the vertebra.

32.   A spinal fusion is an invasive surgical procedure that is performed to join (or "fuse") two or more vertebrae of the spine.

33.   Lumbar fusion surgeries can be performed in a number of different ways.  A procedure in which the surgeon accesses the spine through an incision in the back is called a posterior fusion.  A procedure in which the surgeon accesses the spine through an abdominal incision is called an anterior fusion.  A procedure in which the surgeon accesses the spine through an incision in the psoas muscle –

which is located at the side of the lumbar region and extends into the pelvis – is often called an XLIF (or extreme lateral interbody fusion). A procedure in which the surgeon approaches through both the abdomen and the back is called a 360-degree fusion.

34.    Spinal implants may be used in connection with a fusion surgery to help stabilize the spine and facilitate fusion.

35.    Physicians select the implantable device they use during surgical procedures. Hospitals typically purchase the selected devices directly from vendors.

36.    A spinal implant must be cleared by the Food and Drug Administration (FDA) before a vendor can market that implant in interstate commerce.

37.    Companies can bypass the FDA's premarket approval process if they can show that their proposed device is "substantially equivalent" to other commercially available devices. *See generally* 21 U.S.C. § 360e(b)(1); 21 CFR § 814.1(c)(1).

38.    During the relevant period, the types of implants described below were generally commercially available.

11

39.   A "cage" is an implant that is typically made of polyetheretherketone (PEEK) plastic, and that may be used in a fusion surgery to maintain space between the vertebral segments.

40.   Hospitals pay as much as $7,5000 for each cage.

41.   A "pedicle screw" is a metal implant, typically made of titanium, which is implanted into the bones of the spine to facilitate the fixation of the spinal vertebrae.  Screws are implanted into two or more adjacent spinal segments, and used to anchor "rods" or "plates."

42.   Hospitals pay as much as $2,400 for each screw.

43.   A "plate" is an implant that is used in connection with cervical procedures.  A plate is anchored by screws and placed longitudinally along the front of the cervical spine.

44.   Hospitals pay as much as $2,400 for each plate.

45.   A "rod" is an implant that is anchored by pedicle screws, and that is placed longitudinally along the back of the lumbar and thoracic spine.

46.   Hospitals pay as much as $522.50 for each rod.

47.   A "crosslink" is an implant that can be used to establish a transverse connection between longitudinal implants.

48.   Hospitals pay as much as $1,875 for each crosslink.

## FACTS

49.    Aria Sabit graduated from the Medical College of Virginia in 2002.

50.    Dr. Sabit completed an internship in general surgery at the University of Medicine and Dentistry of New Jersey (UMDNJ) in 2003.

51.    Dr. Sabit completed a residency in neurosurgery at UMDNJ in 2008.

### III. DR. SABIT'S TENURE AT COMMUNITY MEMORIAL HOSPITAL

52.    In early 2009, Dr. Sabit was hired by Dr. Moustapha Abou-Samra, a neurosurgeon who practices in Ventura, California.  Dr. Sabit's employment commenced on or about July 1, 2009.

53.    On June 23, 2009, Dr. Sabit was granted temporary privileges to perform neurosurgical procedures at the Community Memorial Hospital  in Ventura, California (Community Memorial).

54.    On July 9, 2009, Dr. Sabit began performing surgeries at Community Memorial.

55.    On August 11, 2009, Sabit was granted provisional privileges at Community Memorial.

56.    Between June 2009 and December 2010, Dr. Sabit performed approximately 220 spinal fusion surgeries at Community Memorial.

57.    On or about the summer of 2010, medical staff at Community Memorial conducted a non-routine investigation of Dr. Sabit's post-operative complications.

58.    Between July 2010 and November 2010, a Community Memorial peer review committee met at least three times to review Dr. Sabit's surgical complications.

59.    The peer review committee made the following findings:

- after Dr. Sabit arrived at Community Memorial, Sabit was responsible for approximately 71 percent of the hospital's total number of unplanned returns to surgery;

- Dr. Sabit's known infection rate was approximately twice the national average;

- Dr. Sabit placed pedicle screws improperly in approximately 7 percent of the surgeries the committee reviewed;

- Dr. Sabit's "acceptance of complications as within the expected range [is] not consistent with the community standard"; and

- the committee expressed concerns that some of the spinal fusion surgeries that Dr. Sabit performed were not medically necessary.

60.    Among the cases that the committee reviewed were:  a 64-year-old man who experienced multiple organ failure and died after Dr. Sabit operated on him, and four Medicare patients on whom Dr. Sabit performed multiple-level fusions, three of whom were readmitted to Community Memorial for post-surgical complications.

61.     The committee noted multiple instances where Dr. Sabit claimed to have performed procedures in his operative notes where the underlying medical records showed that he had not performed these procedures.

62.     On December 3, 2010, Community Memorial suspended Dr. Sabit. Community Memorial explained that "[t]he suspension is predicated on the determination that immediate action must be taken to protect the life or well-being of patients …."

63.     Also on December 3, 2010, Dr. Abou-Samra terminated his employment contract with Dr. Sabit. Dr. Abou-Samra explained that he was taking this action because of "the occurrence of an unacceptable surgical complication … [and] unethical behavior."

64.     On December 14, 2010, an independent spine surgeon examined four of Dr. Sabit's surgical cases and found significant problems with all four. Specifically, in one case, the reviewer found that Dr. Sabit did not actually perform a surgery that he describes in his operative notes. The reviewer observed that,

> [t]he patient understandably and predictably had a recurrence of her symptoms … *The findings are again inconsistent with what [Sabit] said he did at the first operation.* If for instance he had done a posterior interbody fusion … there would have been little possibility for a recurrence as there would have [been] no disc left to recur.

15

65.    In another case, the reviewer found that Dr. Sabit's scoliosis correction surgery "represent[ed] a significant deviation from an appropriate standard of care."

66.    In a third case, the reviewer found that Dr. Sabit's description of the surgery he performed in his notes "doesn't make sense ... in fact if he had done [the first procedure Dr. Sabit describes in his operative notes, then the second procedure he describes] would have been problematic at best and likely impossible."

67.    On December 21, 2010, Dr. Sabit resigned from Community Memorial.

68.    After Dr. Sabit's resignation, Community Memorial continued to review some of his known post-operative complications, and noted at least five additional surgeries that reflected significant deviations from the standard of care.

69.    Subsequently, Dr. Samuel Small – the Chief of Community Memorial Medical Staff during Dr. Sabit's tenure at Community Memorial – made a sworn statement that,

> I and other members of the [Community Memorial] Medical Staff were made aware of serious concerns regarding surgical cases handled by Dr. Sabit ... In response to these concerns ... an investigation was initiated to evaluate Dr. Sabit's performance and competency ... *One of Dr. Sabit's surgeries resulted in complications that ultimately required further, and allegedly urgent, interventional treatment ... Another surgery resulted in the death of the patient.*

70. On September 17, 2013, the Medical Board of California published an Accusation seeking the revocation of Dr. Sabit's license to practice medicine in California based on gross negligence and corrupt acts.

71. On July 29, 2014, Dr. Sabit stipulated to the surrender of his license to practice medicine in California. In the stipulation, Dr. Sabit admitted that the Medical Board could establish, *inter alia*, that he had performed repeated negligent acts.

72. On August 18, 2014, the Medical Board of California accepted Dr. Sabit's stipulated surrender, and terminated his license to practice medicine in California, effective August 25, 2014.

## IV. DR. SABIT'S MEDICARE CLAIMS

73. Between April 1, 2010, and December 31, 2010, the period during which Dr. Sabit practiced at Community Memorial, Dr. Sabit presented approximately 44 claims for payment to Medicare for the instrumented fusion procedures he performed.

74. Dr. Sabit was paid approximately $808,876 by Medicare for his professional services in connection with the instrumented fusion procedures he performed, or claimed to have performed, at Community Memorial.

75.     Community Memorial received approximately $8,408,293.29 from Medicare for hospital services it provided in connection with the fusion surgeries that Dr. Sabit performed, or claimed to have performed, on Medicare patients.

### A. "Patient A"

76.     On July 8, 2010, Dr. Sabit performed an instrumented fusion surgery on "Patient A," a Medicare patient.[1]

77.     Dr. Sabit performed a T7-L2 (i.e. a seven-level) laminectomy and fusion on Patient A where only a two-level discectomy was indicated.

78.     In his operative notes, Dr. Sabit claimed to have performed laminectomies at T7-T12 that he did not actually perform.

79.     Dr. Sabit failed to properly place the spinal implants in Patient A's spine.

80.     Dr. Sabit submitted claims for payment to Medicare for professional services in connection with his surgery on Patient A, and Medicare paid him $9,765 for this surgery.

81.     Community Memorial submitted claims for payment to Medicare for the hospital services it provided in connection with Dr. Sabit's surgery on Patient A, and Medicare paid Community Memorial $276,228 for those services.

------

[1] The United States will supply detailed information identifying these claims upon entry of an appropriate protective order.

18

82.    Dr. Sabit's surgery on Patient A resulted in significant post-operative complications, including excessive blood loss and severe post-operative pain.  A second surgery was required at another hospital to remove all the spinal hardware that Dr. Sabit implanted.

### B. "Patient B"

83.    On November 6, 2010, Dr. Sabit performed a C4-C7 fusion surgery on "Patient B," a Medicare patient, at Community Memorial.

84.    Dr. Sabit performed a complete corpectomy of C5 even though there was minimal subluxation of C4 on C5, and at most a discectomy and fusion was indicated at that level.

85.    Dr. Sabit also improperly placed the spinal hardware.  Specifically, the cervical plate he placed from C4 to C7 spanned over an unfused (mobile) disc space, and the screws he placed at C7 protruded into Patient B's esophagus.

86.    In his operative notes, Dr. Sabit claimed to have performed an anterior cervical fusion from C4 to C7.  However, Sabit failed to place screws at C5 and C6.

87.    Dr. Sabit submitted claims to Medicare for professional services in connection with his surgery on Patient B, and Medicare paid him $4,861 for this surgery.

88. Community Memorial submitted claims for hospital services it provided in connection with Dr. Sabit's surgery on Patient B, and Medicare paid Community Memorial $128,022 for those services.

89. Dr. Sabit's surgery on Patient B failed, and had to be completely re-done at another hospital.

### C. "Patient C"

90. On October 7, 2010, Dr. Sabit performed an instrumented fusion surgery with Reliance implants on "Patient C," a Medicare patient, at Community Memorial.

91. Patient C suffered from multiple co-morbidities at the time of Dr. Sabit's surgery, including morbid obesity, diabetes, atrial fibrillation, and anemia.

92. Dr. Sabit performed a L3-S1 interbody fusion on Patient C, even though the indications for fusion were completely absent.

93. Dr. Sabit submitted claims to Medicare for professional services in connection with his surgery on Patient C, and Medicare paid him a total of $8,209 for these claims.

94. Community Memorial submitted claims for hospital services it provided in connection with Dr. Sabit's surgery on Patient C, and Medicare paid Community Memorial $347,037 for those services.

95.    Patient C had immediate post-operative complications. She was not discharged from Community Memorial until October 15, 2010 – over one week after the surgery. Patient C was readmitted for post-operative infections on October 19, 2010, and died on May 31, 2011.

**D. "Patient D"**

96.    On November 5, 2009 and November 16, 2010, Dr. Sabit performed instrumented fusion surgeries on "Patient D," a Medicare patient, at Community Memorial.

97.    Dr. Sabit's post-operative notes state that Patient D was "doing remarkably well" following the November 16 surgery. Other providers noted that Patient D was experiencing numerous post-operative complications.

98.    Dr. Sabit's operative notes document the insertion of pedicle screws from L2 to S1, but in fact he did not place screws at L2.

99.    Dr. Sabit submitted claims to Medicare for professional services in connection with his November 2010 surgery on Patient D, and Medicare paid him a total of $4,431 for these claims.

100.    Community Memorial submitted claims for hospital services it provided in connection with Dr. Sabit's November 2010 surgery on Patient D, and Medicare paid Community Memorial $209,021 for those services.

101. Dr. Sabit's surgery caused a cerebrospinal fluid leak in Patient D, which Sabit did not document in his notes.

102. Patient D continued to suffer from post-operative complications, and another surgery by a different physician was required to remove the spinal hardware Dr. Sabit implanted.

## COUNT I

### False Claims Act:  Presentation of False or Fraudulent Claims

### 31 U.S.C. § 3729(a)(1)(A)

103.   The United States re-alleges and incorporates herein by reference paragraphs 1-102.

104.   Dr. Sabit knowingly presented false or fraudulent claims for payment to the United States in violation of the FCA.  Specifically, Dr. Sabit presented claims for payment to the Medicare program for spinal fusion surgeries he claimed to have performed at Community Memorial between April 2010 and December 31, 2010.  These claims were false or fraudulent because:  (a) Dr. Sabit knowingly billed for procedures that he did not actually perform; and (b) Dr. Sabit knowingly performed procedures that were not reasonable and necessary.  Dr. Sabit had actual knowledge of, deliberately ignored, or recklessly disregarded the fact that such claims (a) were for surgical procedures that he did not actually perform, or (b) were for surgical procedures that were not reasonable and necessary.

105.   Dr. Sabit knowingly caused false or fraudulent claims for payment to be presented to the United States in violation of the FCA.  Specifically, Dr. Sabit caused Community Memorial to present claims for payment to the Medicare program for hospital services related to spinal fusion surgeries between April 2010 and December 31, 2010.  These claims were false or fraudulent because:  (a) Dr.

23

Sabit knowingly billed for procedures that he did not actually perform; and (b) Dr. Sabit knowingly performed procedures that were not reasonable and necessary. Dr. Sabit actually knew, deliberately ignored, or recklessly disregarded the fact that Community Memorial was submitting claims for payment to Medicare that (a) were for procedures that Dr. Sabit did not actually perform, or (b) were for hospital services related to surgical procedures that were not reasonable and necessary.

106. By virtue of these false or fraudulent claims for payment, the United States suffered damages in an amount to be determined at trial.

## COUNT II

### False Claims Act: False Statements

### 31 U.S.C. § 3729(a)(1)(B)

107. The United States re-alleges and incorporates herein by reference paragraphs 1-102.

108. Between April 2010 and December 31, 2010, Dr. Sabit knowingly made and caused to be made false statements or records material to false or fraudulent claims for payment submitted to the United States. Specifically, Dr. Sabit made false statements in connection with false claims for payment presented to the Medicare program for spinal fusion procedures that were not reasonable or medically necessary or were not performed as claimed. Dr. Sabit also made false statements in connection with false claims for payment submitted to the Medicare

24

program by Community Memorial for hospital services related to Dr. Sabit's spinal fusion procedures that (a) were not reasonable or medically necessary, or (b) were not performed as claimed.

109. The false statements knowingly made and caused to be made by Dr. Sabit were material to false claims paid by the United States.

110. By virtue of these false or fraudulent claims, the United States suffered damages in an amount to be determined at trial.

## COUNT III

### Unjust Enrichment

111. The United States re-alleges and incorporates herein by reference paragraphs 1 through 102.

112. From April 2010 until December 31, 2010, the United States, through the Medicare program, paid for spinal fusion claims submitted by Dr. Sabit. These claims were not reasonable and necessary, or were not performed as claimed.

113. By reason of the payments described above, Dr. Sabit received money from the Medicare program to which he was not entitled. Thus, Dr. Sabit was unjustly enriched in an amount to be determined at trial.

## COUNT IV

### Payment by Mistake

114. The United States re-alleges and incorporates herein by reference paragraphs 1 through 102.

115. From April 2010 to December 31, 2010, the United States, through the Medicare program, paid Dr. Sabit as a result of mistaken understandings of fact.

116. The United States' mistaken understandings of fact were material to its decision to pay the claims submitted by Dr. Sabit to the Medicare program for surgeries he performed at Community Memorial that were not reasonable and necessary, or were not performed as claimed.

117. The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of statements, certifications and representations by Dr. Sabit, paid Dr. Sabit monies to which he was not entitled. Thus, the United States is entitled to recoup such amounts, which are to be determined at trial.

### PRAYER FOR RELIEF

The United States requests that judgment be entered in its favor and against Dr. Sabit, as follows:

(a)     On Counts I and II (False Claims Act), for treble the United States' damages, together with the maximum civil penalties allowed by law;

(b)   On Count III (Unjust Enrichment), in the amount by which Dr. Sabit was unjustly enriched;

(c)   On Count IV (Payment by Mistake), in the amount by which Dr. Sabit obtained and retained monies to which he was not entitled;

(d)   Pre- and post-judgment interest, costs, and such other relief as the Court may deem appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States requests a trial by jury.

Respectfully submitted,

DATED: September 5, 2014          STUART F. DELERY
                                 Acting Associate Attorney General


                                 /s/ David M. Finkelstein

                                 MICHAEL D. GRANSTON

                                 TRACY L. HILMER
                                 ARTHUR S. DI DIO
                                 DAVID M. FINKELSTEIN
                                 Attorneys, Civil Division
                                 Department of Justice
                                 Post Office Box 261
                                 Ben Franklin Station
                                 Washington, D.C. 20044
                                 Telephone: (202) 616-2971
                                 Facsimile: (202) 307-3852

                                 Email: David.M.Finkelstein@usdoj.gov

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| United States of America ex rel. Cary Savitch and Gary Proffett | ) ) ) ) ) |
| _Plaintiff(s)_ | ) |
| v. | ) ) Civil Action No. 13-03363 DDP (PJWx) |
| Aria O. Sabit, M.D. | ) ) ) ) ) ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Dr. Aria Sabit
848 Ann Street
Birmingham, Michigan
48009

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

United States Department of Justice
David M. Finkelstein, Trial Attorney
601 D Street NW, Suite 9006A
Washington, DC  20004

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

CHRIS SAWYER

Date: 9- 8- 14

Signature of Clerk or Deputy Clerk

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. 13-03363 DDP (PJWx)

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify)*:



My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ 0 _____ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                              *Server's signature*

                                         _____
                                              *Printed name and title*


                                         _____
                                              *Server's address*

Additional information regarding attempted service, etc: